2006 UT 15

Craig **JOHNSON**, Plaintiff and Appellee,

v.

**UTAH DEPARTMENT OF TRANSPORTATION**, Defendant and Appellant.

No. 20040921.

Supreme Court of Utah.

March 10, 2006.

---

**32.** Singer, *supra* note 21, § 47:17, at 281–82.

**33.** *Id.*

Erik M. Ward, Lindy Vandyke, Ogden, Stephen P. Horvat, Salt Lake City, for plaintiff.

Stephen J. Trayner, H. Scott Jacobson, Salt Lake City, for defendant.

Amicus Curiae Mark L. Shurtleff, Att'y Gen., Brent A. Burnett, Asst. Att'y Gen., Salt Lake City.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 In this case, we address the discretionary function exception to the waiver of immunity in Utah's Governmental Immunity Act (the Act). We granted certiorari to clarify when governmental action qualifies for the exception and to reiterate the test by which courts should assess such action.

¶ 2 Plaintiff Craig Johnson filed a claim for injuries suffered after he lost control of his car in a construction zone on Interstate 15 (I–15). Rather than use concrete barriers as dividers, the Utah Department of Transportation (UDOT) had decided to separate the lane in which Johnson was traveling from the construction area by placing orange barrels inside the construction cutouts. The government filed for summary judgment, claiming that the decision to use orange barrels qualified as a discretionary function immunized from liability under the Act. The district court agreed and awarded summary judgment.

¶ 3 Applying this court's four-part test defining discretionary function, the court of appeals reversed the district court's award of summary judgment to the government. We affirm the judgment of the court of appeals.

## BACKGROUND

¶ 4 On September 14, 1996, Johnson was driving south on I–15 when his front tire slid into a twelve- to eighteen-inch deep cutout buttressing his lane of travel. He lost control of his vehicle and drove into two additional cutouts. No painted lines or physical barriers separated Johnson's lane of travel from the cutouts. In lieu of a buffer zone, orange plastic barrels had been placed sporadically inside the cutouts as the only indication of the hazard, although the traffic control plan required additional safeguards. At the time of Johnson's accident, UDOT allowed for one extra lane of traffic—also in violation of the traffic control plan—further limiting any buffer for the traveling public. Dyke LeFevre, UDOT's Region One Director,[1] conceded that this practice is not safe and is something he would never approve or allow the field engineer to approve.

¶ 5 Before taking bids on the I–15 construction project, LeFevre had already decided to use the orange plastic barrels instead of the concrete barriers recommended by the Federal Highway Association (FHA) Guidelines.[2] In making this decision, LeFevre apparently did not request a safety analysis, even though UDOT regularly employs such studies. While LeFevre's supervisor, Clint Topham, UDOT's Deputy Director and "chief engineer for the entire state of Utah, [who] had final say on all transportation related engineering decisions," signed off on the project generally, LeFevre never discussed the decision to use plastic barrels with Topham.

¶ 6 After Granite Construction Company (Granite) successfully bid for the nearly five million dollar project, Granite expressed safety concerns to UDOT. In addition to requesting concrete barriers in place of the orange plastic barrels, Granite asked UDOT to reduce the speed limit from sixty-five to fifty-five miles per hour, the maximum speed limit when the parties consummated the contract.[3]

¶ 7 Agreeing with Granite's concerns, Kent Nichols, UDOT's Project Engineer assigned

---

1. UDOT has split the state of Utah into four regions, each of which is headed by a region director. Region directors are responsible for "(a) executing department policy within the region; (b) supervising project development and operations of the state transportation systems within the region; and (c) promoting the department's public involvement and information programs." Utah Code Ann. § 72–1–205(3) (2004). All of the region directors report to UDOT's Deputy Director. The Deputy Director reports to UDOT's Executive Director.

2. Nonetheless, FHA officials approved the final plan which called for the use of orange barrels.

3. The Utah Legislature raised freeway speed limits across the state after the parties entered into the contract.

to oversee the I–15 project, told LeFevre that worker safety was not receiving adequate consideration and recommended the use of concrete barriers. Nichols provided an estimate from Granite that concrete barriers would cost approximately an additional $540,000 and would enable Granite to complete the project twenty-eight days ahead of schedule.

¶ 8 Subsequently, Nichols sent a letter to Granite saying that UDOT would not pay for the concrete barriers. He explained that LeFevre did not believe the Commission[4] would approve the switch unless Granite could complete the project fifty days early and reduce the additional cost to approximately $450,000. There is no evidence that Topham was involved in the decision, nor any evidence that the Commission would have actually rejected the proposal. In fact, LeFevre never requested the additional funds from the Commission. Granite responded that it could switch to concrete barriers for roughly an additional $495,000—provided UDOT supplied certain construction equipment—but that Granite could not complete the project earlier than twenty-eight days ahead of schedule.

¶ 9 Discussions stalled over this $45,000 difference and the parties made no progress regarding the use of concrete barriers or reducing the speed limit, even though no one disputed that concrete barriers would substantially increase safety. In fact, saving money was the only reason UDOT refused to switch to concrete barriers. UDOT provided no reason for failing to lower the speed limit.

¶ 10 Nearly three months later, in an incident unrelated to the cause of action in this case, a car drove into the construction cutouts and knocked over multiple orange barrels. The accident would have killed Granite employees had it not been for the fact that they had left the site temporarily to obtain additional materials. Granite informed UDOT of the accident and reiterated that it did not believe UDOT had taken adequate measures to ensure worker safety.

¶ 11 Despite Granite's repeated requests, and despite the accident's leaving no doubt that the orange barrels did not adequately protect the public or the workers, LeFevre did not budge from his initial cap of $450,000 to use concrete barriers. Even after the accident, no evidence indicates that LeFevre discussed the increased spending with Topham or with the Commission, or that he requested a reduced speed limit. Consequently, the construction site continued to utilize the orange plastic barrels and maintain the sixty-five miles per hour speed limit at the time of Johnson's accident.[5]

¶ 12 On October 3, 1997, Johnson initiated this action in the district court, suing both Granite and UDOT under negligence theories. UDOT filed a motion for summary judgment, arguing that the claim was precluded by the Act, Utah Code section 63–30–10 (repealed 2004).[6] The district court granted the motion, finding that UDOT's actions qualified for the discretionary function exception to the waiver of immunity under the Act. On appeal, the court of appeals applied the four-part test defining discretionary function articulated in *Little v. Utah*

---

4. Both Nichols's letter and LeFevre's deposition testimony refer only to "the Commission." Presumably, such references are to the Transportation Commission, which has such statutory duties as "determining priorities and funding levels of projects in the state transportation systems for each fiscal year based on project lists compiled by the department" and "making policies and rules ... necessary to perform the commission's duties described under this section." Utah Code Ann. §§ 72–1–301 to –303 (2004).

5. The construction site displayed advisory speed limits of fifty miles per hour, but the sixty-five miles per hour speed limit signs were not removed or covered; the legal speed limit remained sixty-five miles per hour.

6. Since this case began, the Utah Legislature has amended the Governmental Immunity Act. In the new iteration of the Act, the Legislature used identical language to define the discretionary function exception. Thus, case law interpreting the previous discretionary function exception, including this case, will likely govern interpretation of the current version of the exception, now codified as Utah Code section 63–30d–301(5)(a) (2004) (providing exception to the immunity waiver "if the injury arises out of, in connection with, or results from ... the exercise or performance, or the failure to exercise or perform, a discretionary function, whether or not the discretion is abused").

*State Division of Family Services*, 667 P.2d 49, 51 (Utah 1983), and reversed the summary judgment order. *Johnson v. Dep't of Transp.*, 2004 UT App 284, ¶ 30, 98 P.3d 773. We affirm.

## STANDARD OF REVIEW

¶ 13 We granted certiorari to review the court of appeals' reversal of summary judgment. We have jurisdiction over this matter pursuant to Utah Code section 78-2-2 (2002).

¶ 14 Summary judgment should be awarded only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c).

▮ ¶ 15 Appellate courts review a grant of summary judgment for correctness and afford no deference to conclusions of law. *Laney v. Fairview City*, 2002 UT 79, ¶ 9, 57 P.3d 1007. Thus, on appeal the facts must be viewed in the light most favorable to the nonmoving party. *Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1162 (Utah 1993).

## ANALYSIS

¶ 16 UDOT argues that it should be shielded from liability for this accident under the Act, Utah Code Section 63-30-10 (repealed 2004).[7] Without addressing any issues of fault or evaluating the merits of Johnson's case, we consider (1) the applicability of the Act and (2) the Act's discretionary function exception to the waiver of immunity.

### I. THE UTAH GOVERNMENTAL IMMUNITY ACT

▮ ¶ 17 As our precedent repeatedly discusses, the Act requires a three-step analysis. *See, e.g., Laney v. Fairview City*, 2002 UT 79, ¶ 11, 57 P.3d 1007; *Keegan v. State*, 896 P.2d 618, 619-20 (Utah 1995); *Ledfors v. Emery County Sch. Dist.*, 849 P.2d at 1164. First, we must decide if the Act affords immunity through its blanket immunization. *Laney*, 2002 UT 79, ¶ 11, 57 P.3d 1007. Second, we must determine if the Act waives

immunity given the particular circumstances of the case. *Id.* Third, we must consider if the governmental action qualifies for an exception to the waiver of immunity. *Id.*

¶ 18 The parties do not disagree over the first two steps, acknowledging that UDOT's action qualifies under the Act's blanket immunity and that Utah Code section 63-30-8 (repealed 2004)[8] waives this immunity. Accordingly, the issue before this court is whether UDOT's decision to implement, and refusal to modify, a traffic control plan using orange plastic barrels instead of concrete barriers qualifies as an exception to the waiver of immunity under the Act. Specifically, the parties dispute whether the Act immunizes UDOT under the discretionary function exception, which overrides the immunity waiver "if the injury arises out of, in connection with, or results from . . . the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused . . . ." Utah Code Ann. § 63-30-10 (repealed 2004).

### II. THE DISCRETIONARY FUNCTION EXCEPTION TO THE WAIVER OF IMMUNITY

¶ 19 This court has always read the discretionary function exception to the immunity waiver narrowly. To do otherwise would allow the exception to swallow the rule. *Nelson v. Salt Lake City*, 919 P.2d 568, 575 (Utah 1996) ("Nearly all acts performed by government employees involve some amount of discretion. However, discretionary immunity clearly was not designed to cloak the ancient doctrine of sovereign immunity in modern garb."). Accordingly, we have explained that "[d]iscretionary immunity is a distinct, more limited form of immunity and should be applied only when a plaintiff is challenging a governmental decision that involves a basic policy-making function." *Id.*

▮ ¶ 20 We recognize that governmental immunity is essential to the daily operations of the government and enables the govern-

---

7. In its current form, the Act is codified as Utah Code sections 63-30d-101 to -904 (2004 & Supp. 2005).

8. Currently, the immunity waiver is codified as Utah Code sections 63-30d-301 and -302 (2004).

ment to serve the interests of its constituency. In that vein, the discretionary function exception to the immunity waiver is designed to "shield those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseen ways from individual and class legal actions, the continual threat of which would make public administration all but impossible." *Keegan v. State*, 896 P.2d 618, 623 (internal quotation marks omitted). Thus, we will not question the judgment of governmental bodies when such judgment is "regulated by the political process." *Id.*; *Little v. Utah State Div. of Family Servs.*, 667 P.2d 49, 51 ("Where the responsibility for basic policy decisions has been committed to one of the branches of our tri-partite system of government, the courts have refrained from sitting in judgment of the propriety of those decisions.").

¶ 21 While the judiciary strives not to interfere with governmental deliberations addressed by the political process, the government cannot escape liability by simply claiming that some discretion, however minimal, was used in making a decision. On the contrary, the government carries the burden to prove that it qualifies for the discretionary function exception to the immunity waiver. *Little*, 667 P.2d at 51 ("If the State posits immunity on such an exercise of discretion, it must make a showing that a conscious balancing of risks and advantages took place."). The key, of course, is that the government actually exercises a level of discretion in a manner that implicates policy-making and thrusts the decision into the political process. *Keegan*, 896 P.2d at 623–24.

¶ 22 To determine whether governmental action qualifies for the discretionary function exception to the immunity waiver, this court will continue to use the *Little* four-part test. 667 P.2d at 51. Thus, we consider the following questions to resolve the issue:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?

(2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?

(3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?

(4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Id.*

### A. Basic Governmental Objective

¶ 23 First, the challenged act, omission, or decision must necessarily involve a basic governmental policy, program, or objective. *Id.* Because this case deals exclusively with UDOT's ensuring public safety on I–15, the first part of the *Little* test is satisfied.

¶ 24 Our previous cases have left no ambiguity on this point: public safety on the roads is a basic governmental policy. In *Keegan*, UDOT's decision not to raise a cement median barrier satisfied the first part because "the decision involved a basic governmental objective: to wit, public safety on the roads." 896 P.2d at 624; *see also Laney v. Fairview City*, 2002 UT 79, ¶ 17, 57 P.3d 1007 ("[T]he challenged act, omission, or decision does necessarily involve a basic policy, program, or objective, namely public safety ...."). Similarly, this case undoubtedly involves public safety on the roads because Johnson is suing under negligence theories after suffering injuries on the freeway.

¶ 25 Nevertheless, this single factor does not end the inquiry. That public safety decisions *may* immunize the government does not mean that the government is necessarily immunized for every decision implicating public safety. On the contrary, the remaining parts of the *Little* test distinguish decisions which implicate safety and merit immunity from those which do not merit immunity.[9] *Little*, 667 P.2d at 51.

9. For this reason, we disagree with Johnson when he asserts that "the discretionary function exception would bar practically every negligence claim against a governmental entity." While the safety concerns inherent in this case help to satisfy the first part of the *Little* test, Johnson

Accordingly, when a case presents an issue of public safety, we turn a critical eye to the remaining parts of the *Little* test.

### B. Essential to the Realization of Objective

¶ 26 Second, we must determine whether the act, omission, or decision is essential to the realization of the policy, program, or objective in question. *Little*, 667 P.2d at 51. As the court of appeals observed, UDOT failed to make any showing that the orange barrels were essential to the accomplishment of a policy or program. *Johnson v. Dep't of Transp.*, 2004 UT App 284, ¶ 21, 98 P.3d 773. Nor did UDOT demonstrate that the $45,000 differential between LeFevre's desired additional cost and Granite's estimate affected UDOT's ability to finish this or any project.[10] Thus, the decision was not essential to the realization of the governmental objective. To the contrary, the record suggests that the use of concrete barriers would have facilitated the objective of preserving public safety and would have resulted in earlier completion of the project. Thus, UDOT has failed to prove that using orange barrels was essential to public safety or to the I–15 construction project.

¶ 27 *Keegan*, in contrast to this case, provides an example of the government carrying its burden with respect to the second part of the *Little* test. 896 P.2d at 624. The decision at issue in *Keegan* not to raise a concrete median barrier "involved a determination of not only the degree of safety that would be provided by various options considered, but also what degree of safety would be an appropriate goal given time and cost constraints." *Id.* In making the determination, the government used a "report [that] examined many factors including the cost of removing and replacing the barrier." *Id.* Consequently, this court concluded that the government weighed the options, considered the implications of those options, and thus, "the decision was essential to the realization of [the government's] policy." *Id.*

¶ 28 Here, no evidence indicates that UDOT conducted any in-depth safety studies or performed a comprehensive analysis to assess the benefits of the incremental cost of using concrete barriers, even though UDOT conducts such studies regularly.[11] In the absence of a documented report, this court can only surmise what sort of scrutiny and analytical rigor UDOT utilized in making these decisions.

¶ 29 We do not hold that an intensive study is a prerequisite to satisfying this part of the *Little* test. Rather, we reaffirm prior case law that such studies substantially help the government establish that immunity is warranted under the discretionary function exception. Unmistakably, however, a manager's unilateral decision—never discussed with his supervisor—to disregard obvious safety issues without fully considering the implications of his decision does not establish the orange barrels' necessity to the project. The government has not satisfied its burden under this part of the test.

### C. Exercise of Basic Policy Evaluation

¶ 30 Third, we must determine if the act, omission, or decision requires the exercise of basic policy evaluation. *Little*, 667 P.2d at

---

simply overstates the effect on the remaining parts by claiming that "if a plaintiff asserts that a governmental entity negligently made a decision or omission relating to safety, the decision or omission automatically satisfies the first three prongs of the *Little* test."

Furthermore, Johnson argues with this court's statement in *Laney* "that it would not be within a municipality's discretion to construct electrical systems and power lines that do not meet industry safety standards," and thus, the government could not qualify for the discretionary exception. *Laney*, 2002 UT 79, ¶ 25, 57 P.3d 1007. We do not comment on this argument because the language from *Laney* has no application to the facts of this case.

10. Although not at issue in this case, the government may qualify for the discretionary function exception by demonstrating that a particular allocation of funds was based on an analytical project prioritization.

11. In his testimony, LeFevre said he could not remember if UDOT conducted such studies for this project. Viewing this evidence in the light most favorable to the nonmoving party, as we must do on a motion for summary judgment, we will assume UDOT conducted no such study. *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 24, 48 P.3d 918.

51. We agree with the court of appeals that UDOT did not exercise policy evaluation when LeFevre repeatedly refused to pay for concrete barriers despite numerous recommendations from UDOT's Project Engineer to do so. *Johnson*, 2004 UT App 284, ¶ 23, 98 P.3d 773. Accordingly, UDOT does not satisfy the third part of the *Little* test.

■ ¶ 31 As we have explained, "discretionary functions are those requiring evaluation of basic governmental policy matters and do not include acts and decisions at the operational level, namely those everyday, routine matters not requiring evaluation of broad policy factors." *Nelson*, 919 P.2d at 575 (internal quotation marks omitted). While the government may enjoy immunity for policy-making, the "exception is not extended to the ministerial implementation of that basic policy." *Carroll v. State*, 27 Utah 2d 384, 496 P.2d 888, 891 (1972); *Andrus v. State*, 541 P.2d 1117, 1120 (Utah 1975) ("The decision to build the highway and specifying its general location were discretionary functions, but the preparing of plans and specifications and the supervision of the manner in which the work was carried out cannot be labeled discretionary functions.").

¶ 32 Once again, *Keegan* illustrates the kind of scenario that typifies policy-making necessary to satisfy this part of the *Little* test. *Keegan*, 896 P.2d at 624. Describing the manifest policy considerations, the *Keegan* court emphasized that the study had been "circulated throughout and debated within the department." *Id.* Because the government effectively demonstrated department-wide consideration and evaluation, and an incontestable weighing of the policies at issue, we concluded that the decision had required the government to exercise policy considerations to merit immunity under the discretionary function exception. *Id.*

¶ 33 By contrast, in *Carroll v. State*, the government's failure to effectively warn drivers of an abandoned road did not qualify as discretionary simply because a member of the government had made some decision which endangered lives. 496 P.2d at 889–91.

Rather, the court considered whether any policy considerations were at play when the government failed to warn an injured driver that the road ended. *Id.* at 891–92. Because the failure to warn did not arise from deliberative policy making, the court ruled such failure an operational decision pertaining to the manner in which the government carried out the project. *Id.* Thus, the government did not qualify for the discretionary exception to the immunity waiver. *Id.*

¶ 34 The policy decision in the present case was whether or not to perform the construction on I–15. Presumably, Topham, LeFevre, and UDOT's entire policy-making personnel were pivotal in the decision to spend nearly five million dollars on the construction project. The allocation of these funds, combined with the adverse effects on public convenience, placed that decision squarely in the public policy arena. Thus, the overarching decision regarding whether or not to undertake the construction qualifies as the type of policy-making for which the government is entitled to immunity.

¶ 35 The *manner* in which the construction occurred, however, is where the line is drawn between operational and policy decisions. *Keegan*, 896 P.2d at 625 n. 4 (defining operational decisions as those "choices of how specifically to carry out some previously made policy-based decision"). Topham, LeFevre's supervisor, did not expressly approve of the orange barrels and certainly did not engage in policy considerations concerning their use. Instead, LeFevre informed Topham that there were no concerns with the project generally, opting not to discuss the use of orange barrels with Topham. The decision to use plastic barrels was thus so inconsequential in the overall construction project that Topham was not even included in the decision; this epitomizes the kind of operational decision that does not qualify for immunity within the narrow scope of the discretionary exception to the immunity waiver.[12]

■ ¶ 36 While we explained in *Laney* that "at a minimum, a basic cost-benefit anal-

---

12. We do not hold that an employee in LeFevre's position could never exercise basic policy evaluation. Rather, the circumstances of this case do not support that using the orange barrels required such policy evaluation.

ysis and exercise of financial expertise and judgment by the City ... is sufficient under part three of the *Little* test," 2002 UT 79, ¶ 19, 57 P.3d 1007, we did not intend to create blanket immunity for governmental negligence in every case where the government saves money. A real and substantial consideration of the relevant concerns, such as the benefits to public welfare and safety weighed against increases in spending taxpayers' money, is necessary to prove that the government engaged in policy-level considerations.[13] Such an evaluation shifts accountability for decision-making to the public forum and allows the political process to hold government officials accountable for those decisions. These considerations are indicative of the kind of policy-based decisions requiring governmental discretion, as distinguished from truly operational decisions.

¶ 37 An unsubstantiated decision not to spend money is not the same as a thorough and deliberate cost-benefit analysis. Accordingly, LeFevre's ambivalence about requesting the additional $45,000 from the Commission fails to meet the criteria for the type of cost-benefit analysis which may satisfy this third part of the *Little* test.

*D. Requisite Authority for the Decision*

¶ 38 Since the parties agree that, under the fourth part of the *Little* test, UDOT had the authority to make the decision at issue, we need not address this question.

## CONCLUSION

¶ 39 Pursuant to the foregoing analysis, we conclude that UDOT has failed to satisfy the second and third parts of the *Little* test. Thus, its use of orange plastic barrels on this construction project does not qualify for the discretionary exception to the waiver of governmental immunity under the Act. Accordingly, we affirm the court of appeals' reversal of summary judgment and remand this case to the district court.

---

13. This policy underlies our explanation that " '[e]very highway could probably be made safer by further expenditures, but we will not hold UDOT ... negligent for having to strike a difficult balance between the need for greater safety

¶ 40 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.

and the burden of funding improvements.' " *Keegan,* 896 P.2d at 624 (quoting *Duncan v. Union Pac. R.R.,* 790 P.2d 595, 601 (Utah Ct.App. 1990)).